IN RE STEPHEN M. ET AL.*
(AC 28084)

Bishop, Lavine and Borden, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued April 25—officially released August 12, 2008

*Vernon D. Oliver*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellant (petitioner).

*Kathryn Steadman*, for the appellee (respondent mother).

*Karen Oliver Damboise*, for the appellee (respondent father).

*Matthew J. Collins*, for the minor children.

*Opinion*

LAVINE, J. To facilitate the state's parens patriae interest, the legislature has enacted a comprehensive scheme to protect children who are at risk due to their parents' inability or failure to provide for their well-being. See General Statutes § 17a-101; *In re T.K.*, 105 Conn. App. 502, 503–504, 939 A.2d 9, cert. denied, 286 Conn. 914, 945 A.2d 976 (2008). The statutory scheme takes into consideration, however, the fundamental precept that "[p]arents have a constitutionally protected right to raise and care for their own children." *In re Juvenile Appeal (83-DE)*, 190 Conn. 310, 318–19, 460 A.2d 1277 (1983). The statutory scheme consists of a number of interrelated intermediate steps on a path that eventually may lead to the termination of parental

rights. The adjudication of those intermediate steps yields factual findings and orders regarding behavior expected of parents to facilitate reunification of families, if possible, and provides a factual predicate for further proceedings.

The petitioner, the commissioner of children and families, appeals from the judgments of the trial court dismissing the petitions for the termination of the parental rights of the respondent parents[1] with respect to their three children, a son and two daughters.[2] The petitioner claims that when adjudicating the petitions for termination of parental rights, the trial court, *Crawford, J.*, improperly disregarded the prior factual finding that the children were neglected, which was based on the father's sexual abuse of the respondents' son.[3] In light of the fact that a party is barred by the doctrine of collateral estoppel from relitigating a previous finding of neglect during a subsequent termination trial, we agree that the trial court improperly disregarded the earlier neglect finding. We therefore reverse the judgments of the trial court.

The following facts, as found by the court, *Trombley, J.*, after the trial on the neglect petitions,[4] are relevant

[1] In this opinion, we refer to the respondents collectively as the respondents and individually as the mother or the father.

[2] Counsel for the children has adopted the brief of the petitioner.

[3] The petitioner claims that the court improperly (1) rejected the undisputed evidence that the parents had failed to achieve a sufficient degree of personal rehabilitation, (2) failed to give preclusive effect to the finding that continued efforts to reunify the father with his children were no longer appropriate, (3) found that the department of children and families did not make reasonable efforts to reunify the mother with the children, (4) applied the law regarding an ongoing parent-child relationship between the respondents and their son, and (5) failed to give appropriate weight to the petitioner's evidence.

[4] The trial of the neglect petitions was delayed because the respondents were being represented by the same attorney. Judge Trombley ordered the appointment of separate counsel for the respondent mother in the interest of justice and rule 1.7 of the Rules of Professional Conduct. The court concluded that dual representation of the mother and father was inappropriate in that it deprived the mother of the opportunity to pursue an alternate

to the petitioner's appeal. In July, 1991, the father agreed to the termination of his parental rights in a daughter, T, who is not a subject of this appeal.[5] The father has a criminal record. In May, 1994, he received a suspended sentence for threatening and harassment. In 1995, he was arrested and charged with multiple counts of sexual assault in the third degree and risk of injury to a child for acts he perpetrated on T.[6] On February 21, 1996, he pleaded guilty, pursuant to the *Alford* doctrine,[7] to two counts of risk of injury to a child. He received a suspended sentence and a term of probation, but he failed to cooperate with the office of adult probation (adult probation). According to his probation officer, the father was arrogant and resisted treatment at the Northeast Mental Health Sexual Offender Program and eventually was discharged from that program. He refused to discuss his relationships with significant others. Adult probation referred the respondents to the department of children and families (department) prior to the birth of their son.

The department investigated and urged the mother to participate in counseling services for nonoffending parents of sexual abuse victims in order to protect the

course of action, specifically, reunification with the children without the father's participation.

[5] The respondent mother is not T's mother.

[6] The application for an arrest warrant for the father's arrest included the following factual allegations. T disclosed two specific incidents of sexual assault. In November, 1991, when T was five years old, the father threw her onto a bed, pulled down her pants, covered her head with a pillow, lay on top of her and put his private parts next to hers. The second incident occurred in September, 1994, when T was eight years old. The father placed a cushion from a couch over her face, lay on top of her with his pants down. T tried to force him off by kicking him. T then reported the incidents to her mother. When T's mother confronted the father with the allegations, the father responded: "If I did, I did; if I didn't, I didn't. But if you tell the police, I'll blow you away."

[7] See *North Carolina* v. *Alford*, 400 U.S. 25, 37, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

son, who was born in late 1997. The respondents signed a service agreement from the department, requiring twenty-four hour a day adult supervision for their son. The mother was required to protect the boy from harm and to cooperate with the department. The father was to have no unsupervised contact with his son pursuant to the court-ordered conditions of probation. The father violated a no contact order regarding T. In 1998, he was found to be in violation of his probation[8] and sentenced to two years in prison. On July 17, 2002, the father was convicted of breach of the peace in the second degree for acts perpetrated against the mother.

On August 5, 2002, the father reported to the state police that his son had disclosed to him that the son had been sexually assaulted by a neighbor, "Uncle Ray." Using the language of a child, the son later told the investigating state trooper, Steven Corradi, of sexual acts perpetrated on him by his father. The son also told Corradi that he had lied about Uncle Ray because he feared that his father would go to jail.[9] Corradi referred the matter to the department. Orders of temporary custody were filed with respect to the son and the older

[8] In the arrest warrant, the probation officer alleged that the father was "totally unwilling to discuss any issues or circumstances regarding his new family [mother and son] situation or any issues pertaining to his personal life." The probation officer expressed concern that the father was living in the same home as his son.

[9] In his investigation report, Corradi reported the following on the basis of his interview with the son on August 19, 2002. "[The son] told this trooper that he lied last week because he was scared and didn't want his daddy to go back to jail. [The son] went on to state that it was not his Uncle Ray . . . that had been touching his pee pee and butt. 'I like Uncle Ray,' he replied. [The son] stated that it was dad [the respondent] who was trying to touch his pee pee. [The son] said that dad tries to touch his pee pee at night when he is in bed sleeping. [The son] then put his hand down the front of his shorts and said that dad shakes it and when he does that he has his pee pee out and it is small like his then it gets real, real big and he tries to put it in his butt . . . . [The son] then said that dad stops touching his pee pee and then white stuff comes out of daddy's pee pee. [The son] continually pointed to his lower back/butt area and his penis and stated that 'Daddy tries to touch my pee pee and butt.' "

daughter, who was two months old at the time. The orders of temporary custody were sustained by agreement. The son was evaluated by a sexual abuse expert, Rebecca Bowen, in December, 2002.[10] Bowen concluded within a reasonable degree of clinical probability that the son had been sexually abused and that the father was the abuser. Bowen recommended that the son have no contact with the father and that the mother receive therapy. On the basis of Bowen's advice, the department stopped visits between the father and son. The father was evaluated by two sexual offender specialists, who found that he was at medium to high risk to reoffend. They recommended that the father not have unsupervised contact with the children.

On August 22, 2002, the petitioner filed neglect petitions for the respondents' son and older daughter. The petitioner alleged that the respondents' son "is being denied proper care and attention, physically, educationally, emotionally or morally, or . . . is being permitted to live under conditions, circumstances or associations injurious to the well-being of the child . . . ." General Statutes § 46b-120 (9) (B) and (C). The petitioner also

---

[10] In her report dated February 7, 2003, Bowen stated that when the son was shown an anatomically correct drawing of an adult, white male, frontal view, he said, "Daddy. That's my Daddy." The son also stated, "I have seen Daddy's pee-pee. It's bigger. Mine is small." When the son was shown a posterior view of an adult male, he stated, "That's daddy's butt. I have seen Daddy's butt."

Bowen questioned the son about the boy's conversation with Corradi. The son said, "I remember telling the policeman buddy. He's my buddy." The son told Corradi "about [d]addy and his pee pee." The son refused to answer other questions about what he told Corradi. When asked whether Uncle Ray had ever touched his pee pee or if he had seen Uncle Ray's pee pee, the son denied that Uncle Ray had ever touched his penis or shown the son his own penis. The son liked Uncle Ray and said "he wouldn't do that."

When Bowen asked the son if the father had ever touched his pee pee, the son replied: "Daddy say not to talk about pee pee or he will go to jail. . . . Daddy went to jail, then ran out of jail very fast. . . . Daddy took me and mommy to the jail. . . . In the car, he showed us."

alleged that the son was abused in that he "is in a condition that is the result of maltreatment such as . . . sexual molestation or exploitation . . . ." General Statutes § 46b-120 (4) (C). The petitioner alleged that the older daughter "is being denied proper care and attention, physically, educationally, emotionally or morally, or . . . is being permitted to live under conditions, circumstances or associations injurious to the well-being of the child . . . ." General Statutes § 46b-120 (9) (B) and (C). The respondents' younger daughter was born in June, 2003, and agents of the department filed an order of temporary custody when she was two days old. The order of temporary custody was sustained. On June 30, 2003, the petitioner filed a neglect petition for the respondents' younger daughter on the same grounds as those alleged as to her sister.

The neglect petitions were tried before Judge Trombley in April, 2004. In its memorandum of decision, the court identified the core question as whether the son was sexually abused by the father and whether he was an abused child within the meaning of § 46b-120 (4) (C). As to the older daughter, the court stated that the issue was whether she, as a child residing in the same household, was a neglected child as defined by § 46b-120 (9). As to the younger daughter, the question was whether the petitioner was justified in removing her from the respondents' care under the doctrine of predictive neglect.[11]

Judge Trombley found, with respect to the neglect petitions, that the petitioner had proven by a fair preponderance of the evidence that the son was an abused child within the meaning of § 46-120 (4) (C) in that he

[11] "Our statutes clearly and explicitly recognize the state's authority to act before harm occurs to protect children whose health and welfare may be adversely affected and not just children whose welfare has been affected." *In re Michael D.*, 58 Conn. App. 119, 124, 752 A.2d 1135, cert. denied, 254 Conn. 911, 759 A.2d 505 (2000); see also *In re T.K.*, supra, 105 Conn. App. 513.

had been sexually molested by the father. The court based its finding on the father's conviction related to having sexually assaulted T, his lack of cooperation with adult probation, his violation of probation and the testimony of experts who opined that the father had abused the son.[12] The court also found that the son was permitted to live under conditions, circumstances and associations injurious to his well-being. As a consequence of the sexual abuse he had sustained, the son was being denied proper care and attention, emotionally and morally.

As to the respondents' daughters, the court found that the petitioner had proven by a fair preponderance of the evidence that there was a substantial risk that harm would be perpetrated on them. The court found, moreover, that the daughters had been denied proper care and attention, emotionally and morally, and that they were or would have been living under conditions, associations and circumstances injurious to their well-being.[13]

In light of the father's sexual abuse of the son, the risk to which the daughters would have been exposed, and the mother's continuing refusal to accept that the father's abuse was possible, if not substantially probable, the court committed all three children to the custody of the petitioner until further court order. The court found by clear and convincing evidence that it was no longer appropriate for the department to make efforts to reunify the father with the children.

---

[12] Judge Trombley found that the son's "disclosures of the father's sexual molestation, which were made to the trooper, were reliable and trustworthy under all the circumstances, in particular, the child's graphic statement as to the result observed by this four year old of his father's erection!"

[13] With regard to the younger daughter, whom the petitioner took into custody from the hospital when she was only several days old, the court predicated its finding on the doctrine of predictive neglect. See In re Michael D., 58 Conn. App. 119, 124, 752 A.2d 1135, cert. denied, 254 Conn. 911, 759 A.2d 505 (2000).

The court found, however, that the petitioner had not proven by clear and convincing evidence that further efforts to reunify the mother with the children were no longer appropriate. The mother's only failings were her belief, against compelling evidence to the contrary, that the father did not sexually abuse their son and her allowing the father to direct and to control her actions in this case, including her insistence that he and she be represented by the same counsel. The court ordered the mother to engage in nonoffender sexual abuse counseling and denied her permission to see her son until she complied with the order.[14] The court ordered the department to make reasonable efforts to explore the possibility of returning the three children to the mother's care without the participation of the father.[15] The court ordered specific steps to be taken to reunite the mother with the children pursuant to General Statutes § 46b-129 (j). Neither respondent appealed from the judgments that their children were neglected.

Subsequent to the neglect adjudications, the mother failed to cooperate with the department and was unwilling to participate in a family evaluation until January,

[14] Judge Trombley found that the "[m]other was put in a 'catch-22' situation when Northeast Clinical Specialists refused her admission to their program, as the mother would not believe [the son's] disclosures. The mother did not get the therapy because she didn't meet the therapeutic prerequisites. Yet, the mother was deprived of any opportunity to visit [the son] because she didn't do the therapy! The department should have recognized the mother's dilemma and should have arranged visits. The result is that this nonoffending mother has not seen her son since January 24, 2003, over a year and a half! Visits between [the son] and the mother should be therapeutically reinstated and implemented if recommended as a result of the mother's evaluation."

[15] Judge Trombley stated: "The mother will have to make the difficult choice of continuing in her belief of the father's innocence and continuing to reside in a marital relationship with him or in the belief of her son and accepting the compelling evidence and severing all ties to her husband. The mother will have to make this difficult, life-changing decision in the near future, as the [petitioner], without further delay, moves toward termination. This court will afford the mother the opportunity to consider the alternatives devoid of the influence of the father and his attorney."

2005. The evaluation was performed by Nancy Randall, a licensed psychologist, who recommended against visits between the son and the mother. The mother insisted that despite a history of depression and drug and alcohol abuse, she did not feel the need for treatment. Randall also evaluated the father, who acknowledged problems with domestic violence in his intimate relationships but denied any problem with alcohol or drugs.[16] He also denied any need for treatment and insisted that he would not engage in sex offender therapy. Randall concluded that the father may be willing to go through the motions but would not participate in treatment in a therapeutic way. The respondents had not seen their son since February, 2003. Randall opined to a reasonable degree of psychological certainty that there was no evidence to suggest that they were likely to benefit from treatment in the foreseeable future.

The respondents continued to deny that the father had abused the son and maintained, therefore, that there was no reason for them to enter treatment. On September 20, 2004, the petitioner filed petitions to terminate the respondents' parental rights as to their three children, alleging that the respondents had failed to achieve a sufficient degree of personal rehabilitation pursuant to General Statutes § 17a-112 (j) (3) (B) (ii),[17] and through acts of omission and commission denied

---

[16] Randall found that until six months prior to her evaluation, the father abused alcohol. In the intervening six months, the father substituted diet pills for alcohol.

[17] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that . . . the child . . . (3) . . . (i) has been found by the Superior Court . . . to have been neglected or uncared for in a *prior proceeding* . . . (ii) . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent . . . and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." (Emphasis added.)

the children the guidance and control necessary to their well-being under § 17a-112 (j) (3) (C).[18] Each of the petitions was later amended to allege that there was no ongoing parent-child relationship pursuant to § 17a-112 (j) (3) (D).[19]

The trial on the petitions to terminate parental rights began on February 7, 2006, and continued on various dates thereafter. Judge Crawford issued a memorandum of decision in which she denied the petitions to terminate parental rights on September 13, 2006.[20] The court found that the petitioner had not proven by clear and convincing evidence any of the three grounds for termination of parental rights alleged. The court stated, in part, that "the evidence, in many instances was loose, equivocal and contradictory, and [the department] created the situation for the claim of no ongoing parent-child relationship. The underlying basis for the removal of the children, the alleged sexual abuse by father, appears to have been a pretext to remove the children. The evidence does not support a conclusion of acts of omission/commission." The court did not provide an explanation for its conclusion that removing the children from the respondents' care was pretextual. We

---

[18] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that . . . (3) . . . (C) the child has been denied, by reason of an act or acts of parental commission or omission including, but not limited to, sexual molestation or exploitation . . . the care, guidance or control necessary for the child's physical, educational, moral or emotional well-being . . . ."

[19] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that . . . (3) . . . (D) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child . . . ."

[20] Judge Crawford issued a corrected memorandum of decision on September 24, 2006. The corrections were largely editorial in nature and are not at issue here.

acknowledge that the trier of fact is free to evaluate expert testimony as it sees fit, but we note that in its memorandum of decision, the court did not mention observations and opinions contained in the experts' reports pointing to the father as the perpetrator of the son's sexual abuse.

The court also rejected the department's permanency plan finding that adoption was not in the best interests of the children, but that reunification with the respondents was in the children's best interests. The court ordered the children to remain in the custody of the petitioner and ordered the department to file a new permanency plan with the goal of reunification. The petitioner appealed.

I

The petitioner's first claim is that Judge Crawford improperly concluded that the petitioner had failed to prove by clear and convincing evidence that the respondents had failed to achieve a sufficient degree of personal rehabilitation because the court reconsidered issues that had been decided during the trial on the neglect petitions. We agree.

In ruling on the petitions to terminate the respondents' parental rights, the court noted that the three children had been adjudicated neglected on July 26, 2004, and that efforts by the department to reunify the father with the children were no longer appropriate. Nonetheless, the court discounted those factual findings, concluding that "[t]he underlying basis for the removal of the children, the alleged sexual abuse by the father, appears to have been a pretext to remove the children." In a footnote, the court observed that the standard of proof in a trial on a neglect petition is a fair preponderance of the evidence. "This is a trial on a petition for [termination of parental rights] where the standard of proof is clear and convincing evidence." Judge Crawford also disagreed with Judge Trombley's

finding that the son had been abused by the father. She found it significant that the son had not reported to anyone other than Corradi that his father had sexually molested him and was concerned that service providers and evaluators relied on Corradi's report. She also found that the petitioner failed to prove by clear and convincing evidence that the department "made reasonable efforts to reunify [the son] with [the respondents]. The evidence does not support the conclusion that the parents are unwilling or unable to benefit from such efforts."

The petitioner argues that it was improper for Judge Crawford to revisit the question of whether the children were neglected and, in effect, nullify the prior finding of neglect. The petitioner claims that the issue of neglect is res judicata. We agree that during the adjudication of a petition for the termination of parental rights, a trial court may not reconsider the issue of neglect if the children were found to be neglected in a prior proceeding. The doctrine of collateral estoppel precludes the relitigation of the finding of neglect.[21]

---

[21] "The applicability of the doctrines of collateral estoppel or res judicata presents a question of law that we review de novo." *Powell* v. *Infinity Ins. Co.*, 282 Conn. 594, 601, 922 A.2d 1073 (2007). "Claim preclusion (res judicata) and issue preclusion (collateral estoppel) have been described as related ideas on a continuum." (Internal quotation marks omitted.) *Bouchard* v. *Sundberg*, 80 Conn. App. 180, 186, 834 A.2d 744 (2003).

"The common-law doctrine of collateral estoppel, or issue preclusion, embodies a judicial policy in favor of judicial economy, the stability of former judgments and finality. . . . Collateral estoppel, or issue preclusion, is that aspect of res judicata which prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties upon a different claim. . . . For an issue to be subject to collateral estoppel, it must have been fully and fairly litigated in the first action. It also must have been actually decided and the decision must have been necessary to the judgment." (Citations omitted; internal quotation marks omitted.) *Lafayette* v. *General Dynamics Corp.*, 255 Conn. 762, 772, 770 A.2d 1 (2001); see also *In re Juvenile Appeal (83-DE)*, supra, 190 Conn. 316.

A neglect petition and a petition for the termination of parental rights present distinct and separate claims. "[A]n adjudication of neglect relates

The petitioner's claim that a trial court may not reconsider the issue of neglect during a termination of parental rights proceeding presents a mixed question of fact and law because it involves the application of factual determinations to the statutory scheme for the protection of the well-being of children. In such circumstances, an appellate court employs the de novo standard of review. See, e.g., *Friezo* v. *Friezo*, 281 Conn. 166, 180, 914 A.2d 533 (2007). "To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Savings Bank of Manchester* v. *Ralion Financial Services, Inc.*, 91 Conn. App. 386, 389, 881 A.2d 1035 (2005).

General Statutes § 17a-112 sets forth the parameters within which the state may terminate parental rights. The portion of the statute relevant to the termination of parental rights on the basis of a respondent's failure

to the status of the child and is not necessarily premised on parental fault. A finding that the child is neglected is different from finding who is responsible for the child's condition of neglect. . . . [T]he adjudication of neglect is not a judgment that runs against a person or persons so named in the petition; [*i*]*t is not directed against them as parents*, but rather is a finding that the children are neglected . . . . " (Emphasis in original; internal quotation marks omitted.) *In re T.K.*, supra, 105 Conn. App. 505–506.

A petition to terminate parental rights "may irrevocably sever the relationship between parent and child"; *In re Alexander V.*, 223 Conn. 557, 561, 613 A.2d 780 (1992); and consists of two phases: the adjudicatory phase and the dispositional phase. "During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights . . . exists by clear and convincing evidence." *In re Eden F.*, 250 Conn. 674, 688, 741 A.2d 873, reargument denied, 251 Conn. 924, 742 A.2d 364 (1999). "If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase [where the] court must determine whether termination is in the best interests of the child." Id., 689.

to achieve rehabilitation provides that "[t]he Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that . . . (B) the child (i) has been found by the Superior Court . . . to have been neglected or uncared for *in a prior proceeding* . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." (Emphasis added.) General Statutes § 17a-112 (j).

"The purpose of statutory construction is to give effect to the intended purpose of the legislature. . . . If the language of a statute is plain and unambiguous, we need look no further than the words actually used because we assume that the language expresses the legislature's intent. . . . Common sense must be used [when construing statutes] and courts will assume that the legislature intended to accomplish a reasonable and rational result. . . . We must presume that each sentence, clause and phrase in a public act has a purpose and that the legislature did not intend to enact a meaningless law." (Citation omitted; internal quotation marks omitted.) *In re Kachainy C.*, 67 Conn. App. 401, 411, 787 A.2d 592 (2001).

Pursuant to the procedural posture of this case, under § 17a-112 (j) (B) (i), the petitioner did not have to prove at the termination hearing that the children were neglected but only that the children had been found to be neglected in a prior proceeding. Here, the petitioner placed into evidence Judge Trombley's memorandum of decision finding the children neglected and the son abused, findings that were not challenged by way of an appeal. As a matter of law, the memorandum of decision

was clear and convincing evidence that the children had been found neglected in a prior proceeding.[22]

Judge Crawford took issue with Judge Trombley's finding and reconsidered the issue under the clear and convincing standard of proof. The father argues before us that by putting into evidence facts that were before Judge Trombley during the trial on the neglect petitions, the petitioner invited Judge Crawford to reconsider whether the children were neglected. We disagree. The petitioner properly placed into evidence the facts that led to the orders of temporary custody and findings of neglect. Such evidence was necessary to consider the respondents' rehabilitative status vis-a-vis the causes for commitment and whether the causes of the commitment continue to exist. See *In re Cesar G.*, 56 Conn. App. 289, 294, 742 A.2d 428 (2000); see also *In re Allison G.*, 276 Conn. 146, 154 n.4, 883 A.2d 1226 (2005) (psychologist's report material in future proceedings to determine permanent custody).

A finding of neglect is an integral part of the statutory scheme to protect the welfare of children and the parents' right to the custody and care of their children. "A neglect petition is sui generis and, unlike a complaint and answer in the usual civil case, does not lead to a judgment for or against the parties named." *In re David L.*, 54 Conn. App. 185, 191, 733 A.2d 897 (1999). See footnote 21 of this opinion. In a neglect proceeding, the commissioner of children and families "acts not to vindicate her personal rights but, acting for the state as parens patriae, to ensure, first and foremost, the child's safety and, second, a permanent placement of

---

[22] Moreover, the mother concedes that her children were found to be neglected in a prior proceeding. The father does not dispute that Judge Trombley found the children to be neglected but argues that the finding was not made by clear and convincing evidence. The preponderance of the evidence standard, however, applies in a neglect proceeding. See *In re Juvenile Appeal (84-AB)*, 192 Conn. 254, 264, 471 A.2d 1380 (1984).

the child as expeditiously as possible." *In re Allison G.*, supra, 276 Conn. 158–59. An adjudication of neglect has a concomitant purpose: it requires the court to issue specific steps to facilitate the reunification of the parent and child. See General Statutes § 46b-129 (j); *In re Allison G.*, supra, 160–61. "Although the specific steps provide a benchmark by which the court measures whether either reunification or termination of parental rights is appropriate, the court necessarily will consider the underlying adjudication and the attendant findings. . . . Therefore, the adjudication and findings serve a dual function—they provide a context to the court for the specific steps and they provide notice to the parents of issues that may be relevant to the court in determining a permanent plan for the child's custody." (Citation omitted.) *In re Allison G.*, supra, 161.

The hypothetical provided by our Supreme Court in *In re Allison G.* is on point with the issue in this appeal. "For example, in the adjudication of a neglect petition, the trial court could find that a parent had perpetrated abuse on his or her child or had knowingly allowed the abuse to occur but nevertheless denied responsibility for the harm. The department may then propose as one of the steps that the parent undergo counseling to understand the causes and consequences of abuse. In a subsequent proceeding, whether the parent ever acknowledged responsibility for the abuse would be relevant to the court's subsequent determination as to either reunification or termination of parental rights, irrespective of whether the parent had complied with that step." Id. In the case before us, the steps proposed by the petitioner to facilitate the mother's rehabilitation so that she could be reunited with the children, therefore, were predicated on the findings of neglect.[23]

---

[23] As noted, Judge Trombley found by clear and convincing evidence that further efforts to reunite the father with the children were no longer appropriate.

The decisions of our appellate courts make clear that to challenge the outcome of a proceeding in the statutory scheme of our child welfare law, a party must appeal timely from the adjudication of the separate proceedings in the trial court. In *In re Kachainy C.*, supra, 67 Conn. App. 401, the respondent mother claimed that it was improper for the trial court adjudicating the termination of parental rights petition to have relied on a finding made during a hearing on the extension of commitment because the finding was not made by clear and convincing evidence. The respondent mother did not appeal from the extension of commitment and finding that reunification efforts were no longer appropriate. Id., 412. This court concluded that the respondent mother's claim was not reviewable because "[a]n extension of commitment is an immediately appealable final judgment. . . . The issue may not be raised as a collateral attack on the judgment terminating parental rights." (Citation omitted.) Id. The court "adjudicating the termination petition was entitled to rely on [the prior] finding." Id., 413.

In *In re Shamika F.*, 256 Conn. 383, 773 A.2d 347 (2001), the court held that an order of temporary custody is a final judgment for purposes of appeal and that those orders may not be "postponed" until the final judgment terminating parental rights is rendered. Id., 384–85. "[T]emporary custody orders are immediately appealable because an immediate appeal is the only reasonable method of ensuring that the important rights surrounding the parent-child relationship are adequately protected . . . and, further, that an immediate appeal is the only way to ensure the protection of the best interests of children. We conclude, therefore, that the respondent's collateral attack on the temporary custody order, after the order terminating parental rights

has been entered, is a procedurally impermissible substitute for an appeal." (Citation omitted; internal quotation marks omitted.) Id., 385–86;[24] see also *Pamela B. v. Ment*, 244 Conn. 296, 321, 709 A.2d 1089 (1998) (commitment legally supersedes order of temporary custody); *In re Carl O.*, 10 Conn. App. 428, 434, 523 A.2d 1339 (order of temporary custody expires once child found neglected), cert. denied, 204 Conn. 802, 525 A.2d 964 (1987).

There are constitutional rights and public policy interests that support the appealable nature of orders that constitute a final judgment along the path to the termination of parental rights. See footnote 24 of this opinion. Moreover, our child welfare laws are designed in such a way that subsequent proceedings are predicated on findings made and orders issued in prior proceedings. Our sister states with similarly designed comprehensive child welfare laws also require an aggrieved party to appeal to contest interlocutory findings and orders of the trial courts of those states. See, e.g., *Osborne* v. *Dept. of Human Services*, 98 Ark. App. 129, 242 S.W.3d 138 (2007); *S.J.* v. *Dept. of Health & Rehabilitative*

---

[24] Our Supreme Court held in *In re Shamika F.*, supra, 256 Conn. 403, that an order of temporary custody was an immediately appealable final judgment pursuant to *State* v. *Curcio*, 191 Conn. 27, 31, 463 A.2d 566 (1983) (an "otherwise interlocutory order is appealable in two circumstances: (1) where the order or action terminates a separate and distinct proceeding, or (2) where the order or action so concludes the rights of the parties that further proceedings cannot affect them"). "[A] temporary custody order may have a significant impact on a subsequent permanent custody decision . . . [by] establish[ing] a foundation for a stable long-term relationship that becomes an important factor in determining what final custodial arrangements are in the best interests of the child. . . . [Our Supreme Court] concluded that temporary custody orders did so [conclude] the rights of the parties that further proceedings [could not] affect them . . . ." (Citations omitted; internal quotation marks omitted.) *In re Shamika F.*, supra, 403; see also *Madigan* v. *Madigan*, 224 Conn. 749, 757, 620 A.2d 1276 (1993) (temporary custody orders immediately appealable because immediate appeal is only reasonable method of ensuring important rights surrounding parent-child relationship adequately protected).

*Services*, 700 So. 2d 71 (Fla. App. 1997); *In re D.D.*, 643 S.E.2d 83 (N.C. App. 2007). "[C]ourts and state agencies must keep in mind the constitutional limitations imposed [upon them when they undertake] any form of coercive intervention in family affairs . . . [which includes] the right of the family to remain together without the . . . interference of the awesome power of the state." (Internal quotation marks omitted.) *In re Shamika F.*, supra, 256 Conn. 403.

The best interests of the children, especially their interests in family stability and permanency, support the conclusion that findings in earlier child welfare proceedings cannot be attacked collaterally in later proceedings. Id., 405. When a parent has failed to challenge timely a court's finding, "the children's strong interest in stability counsels firmly against allowing a belated appellate challenge to that temporary order." Id. "[A]ppeals are obligatory so that parents may act in the best interest of their children. A grave injustice would be committed against children if a parent were permitted to appeal from a judgment of temporary custody long after they had established a stable relationship with foster parents. We therefore protect the best interest of the children by requiring parents immediately to appeal decisions that . . . interfere substantially with their family integrity. Those parents must do so in a timely fashion not only to protect themselves, but also to protect the children." Id., 406.

On the basis of those same constitutional rights and public policy reasons, a trial court may not, in a subsequent proceeding, disregard and permit relitigation of, a factual or legal determination made or an issue decided in a prior proceeding. Such reconsideration is fundamentally inconsistent with the relevant statutory scheme and is unfair to the petitioner, who represents the state's parens patriae interest, as well as unfair to

the respondent parents and the children. The department sets about to do its work pursuant to the findings made and steps ordered pursuant to a trial on a neglect petition. Those findings and orders place the respondent parents on notice as to what is expected of them if they are to regain custody of their children.[25] The best interests of children is guided by their need for permanency; see *In re Jonathan M.*, 255 Conn. 208, 232, 764 A.2d 739 (2001); which cannot be achieved if there is no finality to the intermediate findings made along the path to termination of parental rights. We therefore conclude that a finding that a child is neglected and abused made by a trial court when adjudicating a neglect petition constitutes an appealable final judgment. If no appeal is filed in a timely fashion, the parents may not collaterally attack those findings during a termination of parental rights trial, and the trial court adjudicating the termination of parental rights is bound by the findings made in the prior proceeding. It was therefore improper for the court to disregard Judge Trombley's finding of neglect and to conclude that "the alleged sexual abuse by the father appears to have been a pretext to remove the children."[26] Moreover, the court's improper redetermination of the grounds for neglect was the basis for the rest of its findings and necessarily infected those findings, which cannot stand.

## II

The petitioner's second claim is that the court failed to give preclusive effect to the finding made on the

[25] During a trial on the termination of parental rights, the issue to be litigated with respect to failure to achieve personal rehabilitation; General Statutes § 17a-112 (j) (3) (B) (ii); is whether the respondent parents can be restored to a constructive useful role as a parent within a reasonable time considering the age and needs of the child or children. See *In re Danuael D.*, 51 Conn. App. 829, 840, 724 A.2d 546 (1999). That issue may be decided, in part, pursuant to a parent's success in complying with the court-ordered steps. Both the petitioner and respondent may put on evidence in this regard.

[26] Because we remand the cases for a new trial, we need not reach the remainder of the petitioner's claims and arguments as to her allegation of failure to achieve rehabilitation.

basis of the neglect proceeding that further efforts to reunify the father with the son were inappropriate. We agree.

In his memorandum of decision on the neglect petitions, Judge Trombley stated, in part, that "[i]n accordance with . . . § 46b-129 (k) (2), and in consideration of the best interests of these three children and their need for permanency, this court finds, as to the father, that continued efforts by the department to reunify the father with any and all of these children are no longer appropriate. That finding is made upon clear and convincing evidence." The father failed to appeal from the court's finding of neglect and abuse as to him. In her memorandum of decision, however, Judge Crawford stated that "[t]his court finds that [the department] failed to prove by clear and convincing evidence that it made reasonable efforts to reunify [the son] with his parents."

General Statutes § 17a-111b (a) provides: "The Commissioner of Children and Families shall make reasonable efforts to reunify a parent with a child unless the court . . . (2) has approved a permanency plan other than reunification pursuant to subsection (k) of section 46b-129." The Superior Court may grant a petition to terminate parental rights "if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts . . . to reunify the child with the parent . . . except that such finding is not required if the court has determined at a hearing pursuant to section 17a-111b . . . that such efforts are not required. . . ." General Statutes § 17a-112 (j).

The issue presented was resolved by this court in *In re Kachainy C.*, supra, 67 Conn. App. 401. The language of the statute "is clear: A finding that it is no longer appropriate for the department to make reasonable

efforts to reunite the family must be made only once
. . . . Common sense also tells us that it would be a
waste of judicial resources to require courts to make
redundant findings." Id., 412. For this reason, it was
inappropriate for the court to reconsider whether the
department had made reasonable efforts to reunite the
son with the father.

## III

The petitioner claims that the court improperly deter-
mined that the department failed to make reasonable
efforts to reunify the mother with her children. We
agree.

The record before us discloses that the son was adju-
dicated neglected and abused as a consequence of the
father's sexual abuse and that he was living in circum-
stances and associations injurious to his well-being. As
to the respondents' daughters, there was a substantial
risk that harm would be perpetrated on them, too. They
were being denied proper care and attention, emotion-
ally and morally, and they were or would have been
living under conditions, associations and circumstances
injurious to their well-being. The steps Judge Trombley
ordered for the mother were predicated on those find-
ings. In order to determine whether the department had
made reasonable efforts to reunify the mother with
the children, the steps and services ordered had to be
viewed in the context of the findings of neglect. See *In
re Allison G.*, supra, 276 Conn. 160–61. Judge Crawford
impermissibly determined, however, that there was no
evidence of sexual abuse on the part of the father
because the son never reported the abuse to anyone
other than Corradi. Without placing the rehabilitative
services offered by the department in the context of
the father's sexual abuse and the mother's need for
services, the court could not evaluate properly the
department's efforts to reunify. For this reason, the

court improperly found that the department failed to make reasonable efforts to reunify the mother with her children.

IV

The petitioner's fourth claim is that the court's finding as to the parent-child relationship between the son and the respondents was clearly erroneous. We agree.

Parental rights may be terminated "if the court finds that there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child . . . . [T]ermination of a noncustodial parent's rights requires a finding that the child has no present memories or feelings for the natural parent." (Citation omitted; internal quotation marks omitted.) *In re Ilyssa G.*, 105 Conn. App. 41, 47, 936 A.2d 674 (2007), cert. denied, 285 Conn. 918, 943 A.2d 475 (2008). "Feelings for the natural parent connotes feelings of a positive nature only." (Internal quotation marks omitted.) *In re Christian P.*, 98 Conn. App. 264, 269, 907 A.2d 1261 (2006).

Kathy Douglas, a clinical social worker, testified at the trial. Douglas was the son's therapist and met with the boy on a weekly basis from November, 2003, until the time Douglas testified. The son appeared to have no recollection of life prior to the time he spent in foster care. He never mentioned the respondents during his therapy sessions. Douglas opined that the son's not remembering the respondents is a mechanism he uses to cope with the trauma he sustained. "The psychological testimony from professionals is rightly accorded

great weight in termination proceedings." *In re Nicolina T.*, 9 Conn. App. 598, 605, 520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987).

This court has determined that parental rights cannot be terminated on the basis of the lack of a parent-child relationship when "the lack of an ongoing parent-child relationship between the respondent and the child was the direct result of the fact that the child was in foster care . . . ." (Internal quotation marks omitted.) *In re Alexander C.*, 67 Conn. App. 417, 424, 787 A.2d 608 (2001), aff'd, 262 Conn. 308, 813 A.2d 87 (2003). Judge Crawford found that the department removed the son from the respondents' care in August, 2002, and suspended the respondents' visits with the son in February, 2003, on the basis of Bowen's evaluation of the son.[27] The court, however, found the documents on which Bowen relied to be unreliable and doubted that the father had abused the son.

On the basis of our review of the record, including the reports of the numerous experts in the mental health and social services fields who have been involved with this family, we cannot discern that the lack of an ongoing parent-child relationship is the fault of the department. The father created the circumstances leading to the removal of his son from the family home and the termination of visitation by sexually assaulting the boy and failing to participate in a meaningful way in sexual abuse therapy. This fact was found at the neglect hearing and may not be reconsidered in the termination of parental rights trial. See part I of this opinion. Moreover, Judge Trombley found by clear and convincing evidence that efforts to reunify the father with his son were no longer appropriate.

As to the mother, Judge Trombley found that efforts to reunify her and her children should be made if the

---

[27] The respondents have never appealed from the suspension of their visitation with their son.

mother was willing to accept services from the department. Although the mother has refused to acknowledge that the father abused the son and there was much discussion about whether she needed to acknowledge that fact in order to receive services, the mother has not accepted that regardless of who molested her son, she needs therapy and support services to understand how to protect her children. Judge Trombley conditioned the mother's right to visit with her son on her complying with his orders for an evaluation and therapy. The mother did not appeal from those orders. Moreover, she cannot continue to live with the father and be reunited with her children. We therefore conclude that there is no evidence in the record to support the court's conclusion that the lack of an ongoing parent-child relationship was a direct result of the son's being in foster care. See *In re Alexander C.*, supra, 67 Conn. App. 424. To the extent that Judge Crawford found that the petitioner was responsible for the lack of an ongoing parent-child relationship, that finding is clearly erroneous.[28]

The judgments are reversed and the cases are remanded for a new trial.

In this opinion the other judges concurred.

---

[28] We need not consider the petitioner's final claim that the court failed to give appropriate weight to her evidence, as the issue is not likely to occur on retrial.