******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# IN RE GABRIEL C.*
## (AC 42961)

# IN RE CATALEYA M.
## (AC 42962)

# IN RE ISABELLA M.
## (AC 42963)

# IN RE SAVANAH F.
## (AC 42964)

Elgo, Devlin and Sheldon, Js.

*Syllabus*

The respondent mother appealed to this court from the judgments of the trial court terminating her parental rights with respect to her minor children. The trial court found, pursuant to statute (§ 17-112 (j) (3)), that the mother had failed to achieve a degree of personal rehabilitation as would encourage the belief that within a reasonable time she could assume a responsible position in the children's lives. The mother claimed that the court, inter alia, improperly denied her motion to disqualify the attorney acting as the guardian ad litem for the children on the ground that the attorney had acted as the mother's guardian ad litem when the mother was a minor, and that the court had improperly admitted into evidence social studies submitted by the Department of Children and Families because the social studies consisted of hearsay and were not ordered by the court in accordance with the applicable statutes (§§ 17a-112 (j) and 45a-717). *Held*:

1. The trial court did not abuse its discretion in denying the respondent's motion to disqualify, as the mother failed to meet her burden of demonstrating that the proceedings in which the attorney served as the mother's guardian ad litem in 2005 were substantially related to the issues addressed in the 2019 termination of parental rights trial; rule 1.9 of the Rules of Professional Conduct was not implicated as the information received by an attorney acting as a guardian ad litem for a minor child was not subject to attorney-client confidentiality pursuant to the Judicial Branch's Code of Conduct for Counsel for the Minor Child and Guardian Ad Litem, the mother made only conclusory statements that the attorney for the minor child might divulge confidential information regarding the mother from the 2005 proceeding, the mother provided no record of the issues in the 2005 proceeding, and the material that might have been confidential in the 2005 proceeding was no longer confidential as the mother had addressed her earlier history and made statements to that effect in the 2019 proceedings, the minor children had a strong interest in having the attorney serve as their guardian ad litem because she had been involved in the matter for three years and was well acquainted with the issues and with the children's interests, which provided a compelling reason for her to serve as their advocate, and to have delayed the trial on the mother's disqualification claim would have severely undermined the children's interests; moreover, contrary to the mother's argument that the appearance of impropriety warranted an absolute preclusion, it was only one factor to consider when balancing the competing interests in disqualifying an attorney, it was not dispositive and did not outweigh other considerations.

2. The respondent mother could not prevail on her claim that the social studies were improperly admitted as they contained hearsay and had not been ordered by the court; the mother failed to specify to which hearsay statements contained in the social studies she objected, which denied the petitioner, the Commissioner of Children and Families, the opportunity to argue which hearsay exception applied to which statement, and, although the court admitted the social studies before it had formally requested them from the department, to interpret §§ 17a-112 (j) and 45a-717 in the manner claimed by the mother would frustrate the underlying purpose of those statutes, which was to put parents on

notice of the allegations that need to be explained or denied, and would have resulted in unnecessary delays in the proceedings.

3. The trial court properly found by clear and convincing evidence, on the basis of its factual findings and reasonable inferences drawn therefrom, that the respondent mother failed to achieve sufficient rehabilitation that would have encouraged the belief that, within a reasonable time, she could have assumed a responsible position in the children's lives; the supportive testimony by the mother's recent service providers was undercut by their lack of specific knowledge about the depth of the mother's difficulties, the record refuted the claims by the mother that she had moved away from abusive relationships and that she had the legal income to support her needs and her children's needs, and, contrary to the mother's claim that the court's determination was based primarily on events preceding 2018, the record demonstrated that the court considered all potentially relevant evidence, including the mother's continued engagements with partners who posed a risk of domestic violence through 2018 and 2019, her inability to be candid and truthful with her providers or the department, and her lack of progress in parenting, domestic violence, and mental health therapy despite years of engaging services.

Argued October 8, 2019—officially released March 4, 2020**

*Procedural History*

Petitions by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor children, brought to the Superior Court in the judicial district of Middletown, Juvenile Matters, and tried to the court, *Quinn, J.*; judgments terminating the respondents' parental rights, from which the respondent mother filed separate appeals to this court; thereafter, the appeals were consolidated. *Affirmed.*

*David E. Schneider, Jr.*, for the appellant (respondent mother).

*Carolyn A. Signorelli*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and Benjamin Zivyon, assistant attorney general, for the appellee (petitioner).

*Hilliary Horrocks*, for the minor children in Docket Nos. AC 42961, AC 42962, and AC 42963.

*Deborah Dombek*, for the minor child in Docket No. AC 42964.

*Opinion*

ELGO, J. The respondent mother appeals from the judgments of the trial court terminating her parental rights with respect to her minor children, Gabriel C., Savanah F., Cataleya M., and Isabella M., and appointing the petitioner, the Commissioner of Children and Families (commissioner), as the statutory parent of the children.[1] The respondent contends that the court improperly (1) denied her petition to disqualify the attorney for her children Gabriel C., Cataleya M., and Isabella M., (2) admitted into evidence social studies during the termination of parental rights trial, and (3) concluded that she failed to achieve the requisite degree of personal rehabilitation required by General Statutes § 17a-112 (j). We affirm the judgments of the trial court.

The following procedural history and facts, which the trial court found by clear and convincing evidence or are otherwise undisputed, are relevant to the resolution of this appeal. Throughout her childhood, the respondent was the subject of both abuse and sexual assault beginning at a young age. By the time the respondent was approximately twelve years old, problems concerning her mental health began to arise. Such problems included post-traumatic stress disorder, attention deficit hyperactivity disorder, and conduct disorder. She also suffered from mood disorder and experienced suicidal ideation. By the age of fifteen, the respondent's difficult situation at home—coupled with her mental health struggles—led to her placement in the custody of the commissioner.

In September, 2010, the respondent had her first child, Gabriel C. Her relationship with Gabriel's father, Jesus C., lasted only three years and was riddled with instances of domestic violence. Jesus' abuse of the respondent was coupled with his heroin addiction. When his relationship with the respondent ended, Jesus ceased all contact with Gabriel.

The respondent thereafter began an intimate relationship with Fernando F., despite her knowledge of his violent criminal background. This relationship too was marked by instances of domestic violence, including one in which he attacked the respondent with a knife. In 2012, the respondent had her second child, Savanah F., fathered by Fernando.

Throughout 2013 and 2014, a number of events occurred that led to the removal of Gabriel and Savanah from the respondent's custody. The Department of Children and Families (department) became concerned about the respondent's inconsistency in taking her medication for her mental health, her hospitalization for a drug overdose, and her reports to hospital staff that she was having great difficulty managing Gabriel's behavior. The respondent was also very rough with her children and was unable to manage them in a loving and caring

manner. In order to address these issues, the respondent agreed to comply with visiting nurses in order to consistently take her medication and further agreed to work with an in-home parenting program and therapeutic day care. These efforts, however, proved to be ineffective. The respondent routinely missed appointments with providers, including those who administered her medication. She would use profane language toward them and also failed to begin therapeutic day care with her children. Moreover, the respondent and Fernando continued to engage in episodes of domestic violence in front of the children, including one instance in which Fernando threatened to kill the respondent.

On September 4, 2014, Gabriel and Savanah were removed from the respondent's care pursuant to an order of temporary custody. On that same date, the respondent was issued specific steps requiring her, in part, to engage in parenting, substance abuse, and domestic violence counseling. On November 3, 2014, Gabriel was adjudicated neglected and committed to the care of the commissioner. On December 23, 2014, Savanah was also adjudicated neglected and committed to the care of the commissioner. Both were placed into foster homes. At this point, the respondent was no longer in a relationship with Fernando and had begun a new relationship with Drashawn M.

In May, 2015, the respondent had her third child, Cataleya M.[2] Due to the verbal and physical domestic violence between the respondent and Drashawn, specific steps were again issued by the department to the respondent as she continued receiving services. Only a few months after Cataleya's birth, the department received numerous reports of abuse that prompted serious concerns. These reports concerned incidents including public fights between the respondent and Drashawn, including an incident in which the respondent stabbed Drashawn while he was holding Cataleya and an incident in which the respondent was severely beaten by Drashawn. Neither parent took any responsibility for these increasingly violent encounters.[3] As a result, the respondent thereafter agreed to be placed with Cataleya at a domestic violence shelter. Notwithstanding her placement at the shelter, she remained in frequent contact with Drashawn and became verbally abusive toward staff when they confronted her about it. When the respondent was found to have breached safety protocols, she was asked to leave the shelter and Cataleya was placed into foster care on August 31, 2015. On September 4, 2015, the department filed an order for temporary custody as to Cataleya. On February 22, 2016, the order of temporary custody was sustained, and Cataleya was adjudicated neglected and committed to the custody of the commissioner.

In May, 2016, the respondent and Drashawn completed an intimate partner violence program. In August,

2016, the respondent gave birth to her fourth child, Isabella M. Although Isabella was initially removed from the respondent's care, the court, *Turner, J.*, returned her to the respondent on October 13, 2016, following five days of evidence in a contested temporary custody hearing. On October 21, 2016, Isabella was adjudicated neglected and was placed under an order of protective supervision for the following six months. The respondent was also ordered to comply with specific steps, which included taking part in domestic violence and anger management counseling, taking prescribed medications, taking part in medication management, and avoiding any contact with Drashawn in any form.

Shortly thereafter, the respondent underwent a court-ordered psychological assessment with Inés Schroeder, a psychologist. Schroeder found that the respondent was unable to recognize incidents of domestic violence or to accurately report those events. Schroeder also observed that the respondent had "great difficulty putting into context all that has happened with her past relationships and truly understanding the impact of DV (domestic violence) on her and her children. She is still struggling with continued problems with [Drashawn] despite multiple attempts to educate her and to help her realize how destructive the relationship is . . . ." Schroeder further noted that the respondent admitted to a domestic violence incident that had occurred on October 5, 2016,[4] and vowed to refrain from contacting Drashawn in the future. The respondent also admitted to having discontinued her mood disorder medications. In the evaluation, Schroeder recommended that the respondent's children remain in foster care until the respondent "can demonstrate some stability in housing and counseling services and no further engagement with [Drashawn]."

Pursuant to the court order of October 21, 2016, and Schroeder's recommendations, the respondent began domestic violence counseling with Evan LeClair in December of that year. Together, a safety plan was developed and the respondent completed a confidential address application to ensure that her address was kept safe. At this point, the respondent had moved to a confidential residence in another town. Her safety plan consisted of not contacting Drashawn, maintaining a confidential residence with cameras, having a peephole in her door, and having a panic button in her apartment.

On March 9, 2017, Kelly McGinley-Hurley, a department supervisor, conducted a scheduled home visit with the respondent. During the visit, the respondent admitted to McGinley-Hurley that she had remained in telephone contact with Drashawn, explaining that she felt obligated to keep him informed about her case. On March 13, 2017, four days after the in-home visit, the respondent had another physical altercation with Drashawn in her apartment. Arriving at the scene,

responding police officers were told by the respondent that Drashawn had stabbed her with a steak knife and had thrown her into a wall. The officers found Isabella on the respondent's bed and further observed drops of blood around Isabella's bassinet. In a statement to the police, the respondent reported that she had invited Drashawn to her apartment so that he could remove a pair of pitbulls. According to the respondent, Drashawn suddenly attacked her and she was cut by a knife as a scuffle ensued over the bassinet where Isabella was sleeping. The police officer noted in his report that, "[b]ased on the totality of circumstances, I did not believe the incident occurred precisely as described by [the respondent]. However, based on her injuries and statement, it did appear that an instance of domestic violence did transpire."

On March 15, 2017, Isabella was again removed from the respondent's care pursuant to an order of temporary custody. The respondent contested the order, and hearings were held in April and July, 2017.[5] On September 29, 2017, the court, *Turner*, *J.*, found that the department had proven by a preponderance of the evidence that the respondent had failed to safeguard Isabella or comply with her specific steps. The court noted that the respondent had provided inconsistent testimony with respect to her version of the events that occurred on March 13, 2017. It further found that the respondent had recently begun a romantic relationship with Josue C., who had a long criminal history of violence. Accordingly, on October 2, 2017, Isabella was committed to the custody of the commissioner.

In July, 2017, the commissioner filed petitions to terminate the parental rights of the respondent with respect to Gabriel, Savanah, and Cataleya.[6] Distrusting authority figures and providers referred by the department, the respondent referred herself for services. She inaccurately reported her history to those providers, however, and prevented them from receiving information from the department in a timely manner. As a result, the respondent's self-selected providers lacked specific knowledge about the depth of her difficulties and the ongoing nature and severity of domestic violence in her life. For example, the respondent insisted that she had no need for medication for her mood disorders and was not candid concerning domestic violence incidents with Drashawn. In addition to compromising her own services, as the court repeatedly found, the respondent undermined the ability of her providers to offer accurate and credible testimony to the court.

The court found that the respondent continued to contact Drashawn and maintained her intimate relationship with Josue, who also proved to be repeatedly violent. On November 2, 2017, a social worker observed bruising on the respondent's neck during an intake meeting with Community Mental Health Affiliates

(CMHA). According to the respondent, she had been involved in a car accident while driving Josue, although her story of the accident changed with each retelling of what had transpired and, inexplicably, no police report regarding the incident existed. On January 11, 2018, the respondent admitted to Kenneth R. Armstrong, a counselor with Franciscan Life Center, that Josue had been physically abusive toward her.

Despite consistently attending visitation sessions with her children, including four courses of supervised visitation and parenting education, the respondent routinely sabotaged her own progress toward rehabilitation. She continued to inflict corporal punishment on the children, spoke with the children during visits about their legal proceedings, and engaged in intimate relationships with people who had histories of domestic violence. For instance, Schroeder reported that the respondent was currently in a relationship with Sean W., who also had a criminal record for assault. Significantly, the respondent did not inform the department about this new relationship. Schroeder reported that the respondent had minimal insight as to how her abusive relationships affected her children. Although the respondent had a long history of engaging in treatment that proved unsuccessful, Schroeder recommended that she continue to seek therapy. At the same time, due to the respondent's consistently poor choices with respect to her intimate partners and her inability to maintain a safe home environment, Schroeder concluded that it would not be in the children's best interests to attempt reunification.

On April 18, 2018, the commissioner filed a petition for the termination of the parental rights of the respondent and Drashawn with respect to Isabella.[7] This petition, along with the petitions filed with respect to Gabriel, Savanah, and Cataleya, alleged the adjudicatory ground of failure to rehabilitate pursuant to § 17a-112 (j).[8] A trial on the termination of parental rights petitions was held on March 5, March 6, March 7, March 11, and March 12, 2019. On April 10, 2019, the court, *Quinn, J.*, rendered a decision granting the commissioner's petitions to terminate the parental rights of the respondent, Jesus, and Drashawn.[9] In a comprehensive and well reasoned memorandum of decision, the court found that the department had proven by clear and convincing evidence that (1) the department had made reasonable efforts to locate the respondent and the three fathers and to reunify the four children with the respondent and the fathers, (2) the respondent, Jesus, and Drashawn had failed to rehabilitate to the degree that they could assume a responsible parenting position in their children's lives, and (3) termination of each parent's rights would be in the best interests of the children. Accordingly, the court appointed the commissioner as the statutory parent of the children. This appeal followed.[10]

I

The respondent first claims that the court improperly denied her motion to disqualify Attorney Hilliary Horrocks. The respondent argues that, pursuant to the policy considerations of rule 1.9 (a) of the Rules of Professional Conduct,[11] Horrocks should have been disqualified because she had previously served as the respondent's guardian ad litem approximately thirteen years earlier. In response, the petitioner asserts that, even if we assume that rule 1.9 applied to Horrocks while she was serving as guardian ad litem for the respondent, the court was well within its discretion in denying the respondent's motion to disqualify. We agree with the petitioner.

The following additional facts are relevant for the resolution this claim. On April 21, 2017, during the consolidated hearings on the order for temporary custody and the motion to modify protective supervision regarding Isabella, the respondent made an oral motion to disqualify Horrocks from acting as the guardian ad litem for the children.[12] The respondent argued that, because Horrocks had acted as her guardian ad litem during a 2005 hearing when the respondent was a minor, she might be privy to confidential information about the respondent obtained in that earlier proceeding. When probed as to what particular confidential information Horrocks could use against her, the respondent speculated that the information might concern her history of abuse and trauma that could impact her parenting abilities. In response, Horrocks stated that she had no recollection of the particulars of her previous position as guardian ad litem for the respondent and further argued that no confidentiality existed as guardian ad litem that would implicate the attorney-client privilege. The court orally denied the respondent's motion, finding that Horrocks' previous service as guardian ad litem for the respondent was too remote in time and that Horrocks did not, thereby, acquire information that could be used against the respondent in the current proceedings. The respondent did not appeal the court's denial of her motion to disqualify Horrocks, nor did she appeal the court's granting of the order of temporary custody or the order committing Isabella to the custody of the petitioner.

On March 5, 2019, the first day of the termination of parental rights trial, counsel for Drashawn, Joseph Geremia, advised the court and all counsel that he had represented the respondent in the past during a delinquency hearing. Geremia further noted that (1) the issue of a potential conflict of interest was addressed by Judge Turner on April 21, 2017, during the order of temporary custody proceedings, (2) Drashawn did not believe there was a conflict, and (3) he had no recollection of his previous representation of the respondent. In response, the respondent orally renewed her motion

to disqualify Geremia "on the grounds that he was her attorney when she was involved as a child with the [department]." Counsel for the respondent argued that, "[t]o the extent that this court might consider evidence of my client's past, which included her past dealings with the department as a youth, she believes that it would be prejudicial to her." Carolyn Signorelli, counsel for the petitioner, argued that any issue regarding disqualification "should have been addressed two, three, however many years ago. And for the [respondent] to now renew the objection on the eve of a trial that's been continued several times is not in the best interest of the children." Signorelli further asserted that Geremia's previous representation of the respondent did not concern a matter that was the same or substantially related to the one before the court—the termination of her parental rights. She also argued that any confidential information obtained by Geremia would be "obsolete or generally known by all the parties in this case, not only based upon the [department] record but also [the respondent's] own admissions and histories that [she] provided to the psychological evaluator."

When the court asked if there was anything further, Horrocks stated that, "in the interest of full disclosure as well," she had previously acted as the guardian ad litem for the respondent in 2005. Horrocks asserted that the issue of her potential conflict was fully addressed by Judge Turner on April 21, 2017. In response, the respondent's counsel simply made the following statement to the court: "And just that [the respondent] makes the same argument as to Attorney Horrocks." The court rejected the respondent's arguments as to both Geremia and Horrocks, finding that rule 1.9 of the Rules of Professional Conduct was not implicated "because the issues are not the same or substantially the same as they were then." It further found that any material that might have been confidential in the past was "certainly not confidential any longer in that [the respondent], herself, has addressed some of her earlier history and statements to that effect."

Thereafter, when asked by the court if there were any other preliminary issues, counsel for the respondent stated that there was "one other matter." Specifically, the respondent's counsel orally objected to Deborah Dombek, attorney for the minor children, withdrawing as counsel for Gabriel, Cataleya, and Isabella. Counsel for the respondent's oral objection also pertained to the change in Horrock's role as the guardian ad litem for all four children to her role as the attorney for Gabriel, Cataleya, and Isabella. In support of his objection, the respondent's counsel proffered only two arguments: (1) Dombek and Horrocks did not seek permission from the court to switch their roles; and (2) the change in roles would affect "any zealous advocacy of the children who were formerly being represented by Dombek . . . ." In response, Dombek

argued that there was a need to separate the children due to Savanah's decision to take a different position than her siblings. Therefore, Dombek felt that she could not zealously advocate for both Savanah's position and the position of her siblings. This change in circumstances prompted Dombek's withdrawal and Horrocks to file an appearance on behalf of Gabriel, Cataleya, and Isabella. Horrocks additionally argued that her extensive involvement in the case and her familiarity with the children positioned her as a proper candidate to act as an attorney on behalf of Savanah's siblings. The court agreed and overruled the objections made by the respondent's counsel.[13]

We begin by setting forth the standard of review governing our resolution of this claim.[14] "The standard of review for determining whether the court properly denied a motion to disqualify counsel is an abuse of discretion standard. The Superior Court has inherent and statutory authority to regulate the conduct of attorneys who are officers of the court. . . . In its execution of this duty, the Superior Court has broad discretionary power to determine whether an attorney should be disqualified for an alleged breach of confidentiality or conflict of interest. . . . In determining whether the Superior Court has abused its discretion in denying a motion to disqualify, this court must accord every reasonable presumption in favor of its decision. Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done. . . .

"Disqualification of counsel is a remedy that serves to enforce the lawyer's duty of absolute fidelity and to guard against the danger of inadvertent use of confidential information. . . . In disqualification matters, however, we must be solicitous of a client's right freely to choose his counsel . . . mindful of the fact that a client whose attorney is disqualified may suffer the loss of time and money in finding new counsel and may lose the benefit of its longtime counsel's specialized knowledge of its operations." (Citation omitted; internal quotation marks omitted.) *In re Nyasia H.*, 146 Conn. App. 375, 380–81, 76 A.3d 757 (2013).

"The competing interests at stake in the motion to disqualify, therefore, are: (1) the [respondent's] interest in protecting confidential information; (2) the [petitioner's] interest in freely selecting counsel of [its] choice; and (3) the public's interests in the scrupulous administration of justice. . . . Rule 1.9 (a) expresses the same standard that we had applied under the Code of Professional Responsibility when a claim of disqualification based on prior representation arose. Thus, an attorney should be disqualified if he has accepted employment adverse to the interests of a former client on a matter substantially related to the prior representation. . . . This test has been honed in its practical application to grant disqualification only upon a showing that the

relationship between the issues in the prior and present cases is patently clear or when the issues are identical or essentially the same. . . . Once a substantial relationship between the prior and present representation is demonstrated, the receipt of confidential information that would potentially disadvantage a former client is presumed." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Bergeron* v. *Mackler*, 225 Conn. 391, 398–99, 623 A.2d 489 (1993).

Citing to the commentary of rule 1.9 of the Rules of Professional Conduct, the respondent argues on appeal that the 2005 matter was "substantially related" to the 2019 termination of parental rights proceedings because there was a substantial risk that Horrocks may use confidential information that she could have obtained in 2005. The commentary states, in relevant part, that "[m]atters are 'substantially related' for purposes of this Rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." Rules of Professional Conduct 1.9, commentary.

First and foremost, we note that any information received by an attorney acting as a guardian ad litem for a minor child is not subject to attorney-client confidentiality.[15] See State of Connecticut, Judicial Branch, Code of Conduct for Counsel for the Minor Child and Guardian Ad Litem, available at https://www.jud.ct.gov/family/GAL_code.pdf. (last visited February 27, 2020). Thus, the information received by Horrocks when acting as the guardian ad litem for the respondent in 2005 was not confidential for purposes of an attorney-client relationship.[16]

Even if a guardian ad litem were bound by rule 1.9 of the Rules of Professional Conduct, the court would still have been acting well within its discretion in denying the respondent's motion to disqualify. We agree with the court's finding that rule 1.9 was not implicated because the issues in the respondent's termination of parental rights trial are not the same or substantially the same as the issues in the 2005 proceeding.[17] Aside from conclusory statements, the respondent provided no record to support her claim that the issues involved in the 2005 proceeding, in which Horrocks served as the respondent's guardian ad litem, had a substantial relationship with the issues addressed in the 2019 trial of the respondent's termination of parental rights. The material issues addressed at the termination of parental rights trial concerned whether (1) the respondent had achieved rehabilitation to the extent that she could provide care for her children within a reasonable time and (2) termination of the respondent's parental rights and the children's commitment to the care of the commissioner was in their best interests. The respondent

does not propose how the issues addressed during Horrocks' time as the respondent's guardian ad litem in 2005 are substantially related to the issues before the court in 2019, nor can we conceive of any basis to conclude as much. Therefore, the respondent has failed to meet her burden of demonstrating that the two proceedings are substantially related.

Moreover, the court found that any material that might have been confidential during the 2005 proceeding was "certainly not confidential any longer in that [the respondent], herself, has addressed some of her earlier history and statements to that effect." Notably, the respondent does not point to any potentially confidential information to which Horrocks was privy, or to that which she herself did not disclose to her providers, Schroeder, or the department.[18] Accordingly, the court properly concluded that there would be no risk of the inadvertent disclosure of confidential information.

We further agree with the petitioner's position that Gabriel, Cataleya, and Isabella had a strong interest in having Horrocks act as their attorney and as their guardian ad litem. Having been involved in the matter for approximately three years, Horrocks was well acquainted with the subject matter of the case and with the interests of the children. See, e.g., *American Heritage Agency, Inc.* v. *Gelinas*, 62 Conn. App. 711, 725, 774 A.2d 220 (courts should be mindful of attorney's specialized knowledge of client's operations when assessing disqualification), cert. denied, 257 Conn. 903, 777 A.2d 192 (2001). Her role as guardian ad litem for the children and her familiarity with their interests thus provided a compelling reason to allow her to remain as their advocate.[19] See, e.g., *In re Samuel R.*, 163 Conn. App. 314, 322, 134 A.3d 752 (2016) ("[c]hildren involved in termination proceedings have a strong interest in the speedy resolution of such proceedings"). Gabriel and Savanah have been in foster homes since 2014, thus compounding the need for the children to have their stable living arrangements resolved in an expeditious manner. Over the course of several years, Horrocks had engaged with the children extensively pursuant to her role as their guardian ad litem. As discussed in part I A of this opinion, to disqualify Horrocks—on the first day of trial, no less—would have clearly delayed the court's ability to render judgment on the petitions for the termination of parental rights, three of which had been filed approximately twenty months before trial on the petitions commenced. Therefore, delaying the trial on this basis would have severely undermined the interests of the children.

Although the respondent argues that even the appearance of impropriety warrants an absolute preclusion, such a per se disqualification standard has been rejected by our Supreme Court. See *Bergeron* v. *Mackler*, supra, 225 Conn. 400 (it was abuse of discretion for court to

disqualify plaintiff's counsel solely on basis of appearance of impropriety). We are mindful that the appearance of impropriety is a factor to consider when balancing the competing interests in disqualifying an attorney. Id. It is not, however, dispositive and certainly does not outweigh the other considerations in this instance. We conclude, therefore, that the court did not abuse its discretion in denying the respondent's motion to disqualify.

## II

The respondent next claims that the court improperly admitted into evidence social studies submitted by the department. According to the respondent, the court abused its discretion by admitting the social studies because they (1) consisted of hearsay and (2) were not ordered by the court itself.[20] We disagree.

The standard of review governing claims of improper evidentiary rulings is well settled. "The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence . . . [and its] ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Internal quotation marks omitted.) *In re Harlow P.*, 146 Conn. App. 664, 681, 78 A.3d 281, cert. denied, 310 Conn. 957, 81 A.3d 1183 (2013).

Under General Statutes § 45a-717 (e) (1) and (3), "[t]he court may, and in any contested case shall, request the [commissioner] . . . to make an investigation and written report to it, within ninety days from the receipt of such request. The report shall indicate the physical, mental and emotional status of the child and shall contain such facts as may be relevant to the court's determination of whether the proposed termination of parental rights will be in the best interests of the child, including the physical, mental, social and financial condition of the biological parents, and any other factors which the commissioner . . . finds relevant to the court's determination of whether the proposed termination will be in the best interests of the child. . . . The report shall be admissible in evidence, subject to the right of any interested party to require that the person making it appear as a witness, if available, and subject himself to examination."

Practice Book § 35a-9 further provides that "no disposition may be made by the judicial authority until any mandated social study has been submitted to the judicial authority. Said study shall be marked as an exhibit subject to the right of any party to be heard on a motion in limine requesting redactions and to require that the author, if available, appear for cross-examination."

Moreover, the statute governing the termination of parental rights incorporates the requirements of § 45a-717 when rendering judgment on such petitions. See General Statutes § 17a-112 (j) ("[t]he Superior Court, upon notice and hearing as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section").

A

The respondent first argues that the social studies were inadmissible because they contained hearsay. The respondent, however, does not specify to which hearsay statements contained in the social studies she objects. In fact, her motion in limine argued only that the social studies did not satisfy the business record exception to the rule against hearsay.

Notwithstanding her argument, "[t]he respondent did not state with any specificity which parts of the reports she believed were inadmissible hearsay. Thus, the petitioner was not given the opportunity to argue which hearsay exception applied to which statement . . . . The respondent failed to apprise the court adequately as to what statements by which declarants she objected." (Citations omitted; internal quotation marks omitted.) *In re Tayler F.*, 111 Conn. App. 28, 51–52, 958 A.2d 170 (2008), aff'd, 296 Conn. 524, 995 A.2d 611 (2010). Accordingly, we decline to review this claim.

B

The respondent next argues that the social studies were improperly admitted because the court had not requested their production pursuant to § 45a-717 (e). In response, the petitioner argues that the social studies were submitted to the court as a proactive measure to comply with §§ 17a-112 (j) and 45a-717 (e) (1). According to the petitioner, to preclude the social studies merely because the court had not first requested their production—which it was statutorily mandated to do—would elevate form over substance and serve only to delay the proceedings. We agree with the petitioner.

The respondent does not argue that the social studies were irrelevant, nor does she dispute that the court was obligated by statute to consider the social studies before judgment on the petitions could be rendered. Rather, the respondent asks this court to hold that the court abused its discretion by admitting the social studies before it had formally requested them from the department. The issue, however, is not whether the department or the court completely failed to satisfy a statutory requirement in rendering judgment on the petitions for the termination of parental rights. See, e.g., *In re Shaiesha O.*, 93 Conn. App. 42, 43–44, 887 A.2d 415 (2006) (it was reversible error when court failed to hold department to its statutory burden to show it made reasonable efforts to reunify respondent with daughter). Instead, the respondent takes issue with the fact

that the department sought to comply proactively with the relevant statutes in a manner that would expedite the proceedings.[21] Yet, for all intents and purposes, the court and the department did precisely what the statute required it to do: to produce the social studies before judgment on the petitions was rendered.

Thus, we decline the respondent's invitation to read §§ 17a-112 and 45a-717 (e) in a manner that plainly would frustrate the underlying purposes that these two statutes serve. As our Supreme Court has explained: "The purpose of the social study is to put parents on notice of allegations that need to be explained or denied." *In re Juvenile Appeal (84-AB)*, 192 Conn. 254, 260, 471 A.2d 1380 (1984). Moreover, "[b]ecause the parent-child relationship is at issue, all relevant facts and family history should be considered by the trial court when deciding whether to terminate the respondent's parental rights. . . . The entire picture of [the parent-child relationship] must be considered whenever the termination of parental rights is under consideration by a judicial authority." *In re Brianna F.*, 50 Conn. App. 805, 814, 719 A.2d 478 (1998). It is axiomatic that "[w]e construe a statute in a manner that will not . . . lead to absurd results." (Internal quotation marks omitted.) *In re Jusstice W.*, 308 Conn. 652, 670, 65 A.3d 487 (2012). To hold otherwise would not only defeat the purposes of the statutes governing the admission of social studies but would also result in an unnecessary delay in the proceedings at issue here. Accordingly, the court did not abuse its discretion by admitting the social studies into evidence.

III

Lastly, the respondent claims that the court improperly found that the department had proven by clear and convincing evidence that she had failed to achieve the degree of personal rehabilitation that would encourage the belief that, within a reasonable time, she could assume a responsible position in the lives of the children.[22]

"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. In the adjudicatory phase of the proceeding, the court must decide whether there is clear and convincing evidence that a statutory ground for the termination of parental rights exists." *In re Jennifer W.*, 75 Conn. App. 485, 493, 816 A.2d 697, cert. denied, 263 Conn. 917, 821 A.2d 770 (2003). "Failure of a parent to achieve sufficient personal rehabilitation is one of six statutory grounds on which a court may terminate rights pursuant to § 17a-112." (Internal quotation marks omitted.) *In re Briana G.*, 183 Conn. App. 724, 728, 193 A.3d 1283 (2018).

"The trial court is required, pursuant to § 17a-112, to analyze the [parents'] rehabilitative status as it relates

to the needs of the particular child, and further . . . such rehabilitation must be foreseeable within a reasonable time. . . . Rehabilitate means to restore [a parent] to a useful and constructive place in society through social rehabilitation. . . . The statute does not require [a parent] to prove precisely when [he or she] will be able to assume a responsible position in [his or her] child's life. Nor does it require [him or her] to prove that [he or she] will be able to assume full responsibility for [his or her] child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he or she] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he or she] can assume a responsible position in [his or her] child's life. . . . In addition, [i]n determining whether a parent has achieved sufficient personal rehabilitation, a court may consider whether the parent has corrected the factors that led to the commitment, regardless of whether those factors were included in specific expectations ordered by the court or imposed by the department." (Citations omitted; internal quotation marks omitted.) *In re Shane M.*, 318 Conn. 569, 585–86, 122 A.3d 1247 (2015). "As part of the analysis, the trial court must obtain a historical perspective of the respondent's child caring and parenting abilities, which includes prior adjudications of neglect, substance abuse and criminal activity." (Internal quotation marks omitted.) *In re Damian G.*, 178 Conn. App. 220, 238, 174 A.3d 232 (2017), cert. denied, 328 Conn. 902, 177 A.3d 563 (2018).

"While . . . clear error review is appropriate for the trial court's subordinate factual findings . . . the trial court's ultimate conclusion of whether a parent has failed to rehabilitate involves a different exercise by the trial court. A conclusion of failure to rehabilitate is drawn from *both* the trial court's factual findings and from its weighing of the facts in assessing whether those findings satisfy the failure to rehabilitate ground set forth in § 17a-112 (j) (3) (B). Accordingly . . . the appropriate standard of review is one of evidentiary sufficiency, that is, whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court." (Emphasis in original; footnote omitted; internal quotation marks omitted.) *In re Shane M.*, supra, 318 Conn. 587–88.

"An important corollary . . . is that the mere existence in the record of evidence that would support a *different* conclusion, without more, is not sufficient to undermine the finding of the trial court. Our focus in conducting a review for evidentiary sufficiency is not

on the question of whether there exists support for a different finding—the proper inquiry is whether there is *enough* evidence in the record to support the finding that the trial court made." (Emphasis in original.) *In re Jayce O.*, supra, 323 Conn. 716.

In its comprehensive memorandum of decision, the court found by clear and convincing evidence that the department had offered the respondent a "multitude of services" in an effort to facilitate reunification with her children. The court further found by clear and convincing evidence that the children had been previously adjudicated as neglected. The court also found by clear and convincing evidence that, despite the numerous services she engaged with, the respondent had not "rehabilitated to the extent that [she] could care for these children within a reasonable period of time, given the children's ages and need for permanency." Upon our review of the record, the factual findings made by the court in its decision are well supported by the evidence it credited.

The court found that beginning in 2014, the department offered several support services to the respondent pursuant to a reunification plan after Gabriel and Savanah were removed from her care. These services included visiting nurse services to ensure that she received her daily medication and an in-home parenting program and therapeutic day care. The court found that the respondent "sabotaged the plan" by regularly missing appointments and never beginning the therapeutic day care for the children. The court further found that when the respondent was given specific steps in relation to the order of temporary custody of Gabriel and Savanah, she exhibited the same issues that "remain today: inconsistent engagement with mental health and medication management, a demonstrated lack of benefit from treatment, intimate partner violence and a significant need for parenting skills."

The continued issues with domestic violence and repeated engagement with partners who had a history of domestic violence were highlighted by the court. For instance, the court found that it was not even three months after Cataleya's birth before several new domestic violence incidents occurred between Drashawn and the respondent. This included an incident in which Drashawn had "severely beaten" the respondent, with the court finding that neither had assumed any responsibility "for these increasing violent encounters." The court also found that, despite entering a shelter, the respondent was verbally abusive toward staff and was eventually asked to leave after she threatened to reveal the shelter's location to the media.

The court further highlighted the domestic violence incident of March 13, 2017, and the respondent's "varying ways in which [she] reported [such incidents] to authorities over time . . . ." As the court noted, "[t]he

report by the police officer on the scene on March 13, 2017 is very different than [the respondent's] sworn testimony in court some months later. Her later report demonstrates how she changed her description of the events to cast herself as the entirely blameless participant in the domestic violence." The court continued to emphasize the fact that, despite the safety protocols in place, she violated each one when she invited Drashawn to her undisclosed apartment location and allowed him to enter. Taking judicial notice of Judge Turner's findings, the court noted that the respondent's "sworn testimony about this event in court fails to report that she invited Drashawn to her apartment, as she had told the police officer in her sworn statement at the time of the incident. . . . Her inability to be honest about her own participation in the events which ensued is apparent. That inability has had important consequences for her ultimate rehabilitation and ability to care safely for her children and take steps to keep them from harm." The court continued, finding that, "[d]espite many years of services from numerous service providers to the present time, [the respondent] had not yet learned to protect herself and avoid situations in which intimate partner violence could occur. Her inability to act on what she was taught was demonstrated as late as . . . January, 2019, when [the respondent] attempted to contact Drashawn by calling his mother. The court credits the paternal grandmother's testimony about the many times [the respondent] called her in the past. During the last contact in January, 2019, [the respondent] wanted Drashawn to help fix her car."

In addition, the court noted the respondent's repeated engagements with Drashawn and her relationship with Josue. When she began her relationship with Josue, the respondent "denied there were any difficulties" as their relationship progressed or that his conduct constituted domestic violence. This was despite her knowledge that Josue had a violent criminal history. The court also found that the respondent made efforts to conceal these issues from the department, specifically failing to disclose her relationship with Josue to her domestic violence counselor despite learning of his criminal history. Moreover, the court found the respondent's explanation for injuries she had sustained to be dubious. As the court explained, the respondent's explanation that she had been the victim of a hit and run "was not consistent or believable. Her inconsistent reports to [the department] call her veracity [into] doubt. The court finds, from all the testimony and other evidence, as well as the reasonable inferences to be drawn from it, that once again, that [the respondent] was concealing a domestic violence incident with Josue."

The court further found that, despite the many parenting skill services provided to her, the respondent failed to benefit meaningfully from those services. As the court explained, the respondent "is unable to under-

stand that corporal punishment is self-defeating and inappropriate, when managing and disciplining young children. Further, she continues, up to the present time and at nearly every visit, to engage her children about legal matters before this court and their return home to her care." The court noted the respondent's continued engagement with services provided to her, including parenting counseling and the fact that she maintained a strong connection with her children. However, despite being capable of conducting herself appropriately since the time of Cataleya's removal, "[s]he maintained then, as she does now, that her beliefs concerning threats and other forms for punishment if the children do not comply with her direction are appropriate."[23]

As the court found, the respondent "continues to lack to the present time, any growing insight into her own role in her difficult life. Her inability to truthfully examine her own behavior is a principal reason that [the respondent's] progress toward rehabilitation has only been minimal. Her conduct has been to the detriment of her ability to grow and mature in her ability to deal with her past trauma and current deficits. It renders [her] unable to care safely for herself and prevents her from being able to safely care for her children, despite her claims and protestations to the contrary. The events of March 13, 2017, and the varying ways in which [the respondent] reported them to authorities over time, clearly demonstrates her inability to recount important events accurately."

In challenging those findings, the respondent cites various trial testimony concerning (1) her recent treatment with a provider, (2) her moving away from abusive relationships, and (3) her legal income to support the needs of her children. The respondent also asserts that the court did not take into consideration events after 2017. As previously discussed, our determination on review is only "whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]." *In re Shane M.*, supra, 318 Conn. 588.

First, the respondent points to her engagement with Jada Brown, an individual and family therapist with whom the respondent began treatment in February, 2018. The respondent cites to Brown's trial testimony in which Brown stated that the respondent "does very well utilizing what we talk about. . . . [S]he's . . . doing very well managing her emotions considering the circumstances." Brown further suggested in her testimony that the respondent did not need psychotropic medication to manage her mental health. The trial court, however, found that, despite the most recent providers giving testimony supportive of the respondent's efforts, "the weight of the testimony of all these

supportive providers was undercut by their lack of specific knowledge about the depth of [the respondent's] difficulties as well as the ongoing nature of and the severity of the domestic violence incidents in her life. The lack of proper interaction with [the department] regarding [the respondent's] background hampered their ability to provide the services to [the respondent] that she required. When asked on cross-examination about such matters, each had [admitted the need to] reevaluate their positions about [the respondent's] progress." Indeed, the record reveals that the respondent had failed to disclose to Brown (1) that she had not followed the safety protocol preceding the incident of March 13, 2017, and (2) the nature and extent of her relationship with Josue. Moreover, the respondent's argument is contradicted by her own testimony in which she outright rejected Brown's definition of domestic violence as well as denying that Josue's emotional abuse of her constituted domestic violence.

Second, the respondent's claim that she had moved away from abusive relationships is refuted by the record. As the court found, the respondent's inability to disengage from partners prone to domestic violence was illustrated by her most recent attempt to contact Drashawn in January, 2019, and that she had routinely attempted to reach Drashawn through his mother. The record further reveals that she had continued an intimate relationship with Josue as late as December, 2018, despite testimony from her current boyfriend, Philip H., that his impression was that Josue and the respondent had separated three months earlier. Thus, the court's finding that the respondent remains "prone to relationships with domestic violence" is well supported by the evidence.

Third, the respondent argues that she has the legal income to support her needs and the needs of the children. The court, however, found that, although Philip could provide financial support, "this is not an established relationship and appears to have much to do with her need for financial support from others. The court finds that it is far too little too late. Her new relationship cannot begin to address [the respondent's] own psychological issues . . . ." Notably, the two had been dating consistently only for approximately five months and see each other only twice per week. Accordingly, the court's belief that this new relationship would not provide the requisite financial stability for the respondent or for her children is well founded.

The respondent's final claim is that the court's determination was based largely on events preceding 2018. This claim is without merit. We first note that "the court in a termination of parental rights hearing should consider *all* potentially relevant evidence, no matter the time to which it relates. . . . In order for the court to make a determination as to the respondent's pros-

pects for rehabilitation, the court was required to obtain a historical perspective of the respondent's child caring and parenting abilities. . . . Because the parent-child relationship is at issue, all relevant facts and family history should be considered by the trial court when deciding whether to terminate the respondent's parental rights. . . . The entire picture of that relationship must be considered whenever the termination of parental rights is under consideration by a judicial authority." (Citations omitted; emphasis in original; internal quotation marks omitted.) *In re Christopher B.*, 117 Conn. App. 773, 787, 980 A.2d 961 (2009). Additionally, "[i]n the adjudicatory phase, the court *may* rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Emphasis in original; internal quotation marks omitted.) *In re Jennifer W.*, supra, 75 Conn. App. 495.

In the instant matter, the court highlighted the pattern of domestic violence and inconsistent medication management that the respondent had engaged in over a sustained period of time, notwithstanding the concerted efforts by the department to have her engage in services to address these long-standing problems. Thus, the court was well within "its discretion in considering evidence of the department's involvement with the respondent and [the children] before the [2017 petitions], and in according appropriate weight to that evidence." *In re Christopher B.*, supra, 117 Conn. App. 787–88. Moreover, the court's findings in its memorandum of decision are, in many respects, focused on her continued attempts to contact Drashawn and her continued interactions with Josue throughout 2018. As previously noted, the court credited the testimony of Drashawn's mother that the respondent had contacted her as late as January, 2019, in an attempt to reach Drashawn. Additionally, the court took into account Schroeder's evaluations in March and April, 2018, when it assessed the progress that the respondent had made in her rehabilitation.

Given the respondent's representations concerning her contact with Josue, the court properly considered their arrest for criminal trespass in March, 2018. The evidence before the court demonstrates that the respondent admitted to her counselor in January, 2018, that Josue was abusive but she was no longer in a relationship with Josue and denied knowing about his history of domestic violence until several months into the relationship. Finally, the court considered the respondent's testimony at trial in March, 2019, during which the respondent claimed that she had sustained a head injury in November, 2017, as a result of a pedestrian hit and run accident that she inexplicably failed to report. The court found the respondent so lacking in credibility that

it concluded that the respondent was concealing yet another incident of domestic violence with Josue, and that, therefore, she could not maintain her own stability and safety. While we reiterate that the court was not required to do so for adjudicatory purposes, the respondent's claim that the court failed to consider relevant evidence after 2017 is belied by the record.

In sum, it is clear that the court's memorandum of decision was based on its considerations of the respondent's continued engagement with partners who pose a risk of domestic violence, her inability to be candid and truthful with her providers or the department, and her lack of progress in parenting, domestic violence, and mental health therapies despite years of engaging such services. "Although the respondent encourages us to focus on the positive aspects of [her] behavior and to ignore the negatives, we will not scrutinize the record to look for reasons supporting a different conclusion than that reached by the trial court." *In re Shane M.*, supra, 318 Conn. 593. Therefore, we conclude that the court reasonably could have determined, on the basis of its factual findings and the reasonable inferences drawn therefrom, that the respondent failed to achieve sufficient rehabilitation that would encourage the belief that, within a reasonable time, she could assume a responsible position in the children's lives.

The judgments are affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2012); we decline to identify any party protected or sought to be protected under a protective order or a restraining order that was issued or applied for, or others through whom that party's identity may be ascertained.

** March 4, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] Pursuant to Practice Book § 67-13, the attorney for Savanah F. filed a statement adopting the respondent's brief in her appeal. We further note that the attorney for Gabriel C., Cataleya M., and Isabella M. filed a brief adopting the commissioner's position with respect to the issues concerning the admission of the social studies and the trial court's termination of the respondent's parental rights.

[2] Although the department was under the impression that Cataleya was the child of Drashawn M., a paternity test would later reveal that Fernando F. was, in fact, Cataleya's father.

[3] For instance, after beating the respondent, Drashawn downplayed the incident and stated that he had only "mushed" her face.

[4] The October 5, 2016 domestic violence incident occurred approximately one week before the court vacated the temporary custody order regarding Isabella. In a police report of the incident, the respondent admitted that Drashawn had choked and slammed her head during an argument about her possessions, and she further admitted to smashing his car window with a hammer as he left.

[5] These consolidated hearings addressed both the order for temporary custody and the motion to modify protective supervision.

[6] The petitions also respectively named the respondent fathers of the children: Jesus, Fernando, and Drashawn, the last of whom was presumed to be the father of Cataleya at the time. It was not until August 2, 2017, that a paternity test revealed that Fernando was Cataleya's father. A motion to

amend the petition to reflect this fact was granted on August 22, 2017. The commissioner withdrew her petition as to Drashawn on September 15, 2017.

[7] On June 12, 2018, the petitions for the termination of parental rights with respect to all four children were consolidated.

[8] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court, upon notice and hearing as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the [department] has made reasonable efforts to locate the parent and to reunify the child with the parent . . . (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected, abused or uncared for in a prior proceeding, or (ii) is found to be neglected, abused or uncared for and has been in the custody of the commissioner for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

[9] The court adjudicated Jesus as having failed to rehabilitate and terminated his parental rights by default after the department published notice in his last known location. Fernando consented to the termination of his parental rights.

[10] Neither Fernando nor Drashawn have appealed from the judgments terminating their parental rights.

[11] Rule 1.9 (a) of the Rules of Professional Conduct provides that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing."

[12] The respondent's oral motion to disqualify also sought to disqualify Joseph Geremia, counsel for Drashawn, arising out of his previous representation of the respondent when she was a child. The court denied the respondent's motion as to Geremia, noting that Geremia, as counsel for Drashawn, did not appear for any portion of the hearing, nor did he participate in any manner. The respondent did not appeal from the court's denial of her motion, nor has she appealed Judge Quinn's denial of her motion to disqualify Geremia.

[13] The court's ruling on this issue is not before us on appeal.

[14] The petitioner also argues that the respondent's March 5, 2019 oral motion to disqualify submitted to Judge Quinn was a collateral attack on Judge Turner's April 21, 2016 ruling on the same issue. We do not believe collateral estoppel is applicable under the current circumstances.

"Collateral estoppel, or issue preclusion, is that aspect of res judicata which prohibits the relitigation of an issue when that issue was *actually litigated* and *necessarily determined* in a prior action between the same parties upon a different claim." (Emphasis in original; internal quotation marks omitted.) *Lafayette* v. *General Dynamics Corp.*, 255 Conn. 762, 772, 770 A.2d 1 (2001). "Issue preclusion arises when an issue is actually litigated and determined by a valid and final judgment, and that determination is essential to the judgment." (Internal quotation marks omitted.) *Cumberland Farms, Inc.* v. *Groton*, 262 Conn. 45, 58, 808 A.2d 1107 (2002). "If an issue has been determined, but the judgment is not dependent upon the determination of the issue, the parties may releitigate the issue in a subsequent action." *Gladysz* v. *Planning & Zoning Commission*, 256 Conn. 249, 260, 773 A.2d 300 (2001).

Even in the absence of a determination as to whether Horrocks had a conflict of interest that warranted her dismissal, a judgment on the neglect petitions—which were the basis of the proceedings before Judge Turner—could have been validly rendered. See *In re Kyllan V.*, 180 Conn. App. 132, 139, 181 A.3d 606, cert. denied, 328 Conn. 929, 182 A.3d 1192 (2018). Thus, a determination of that issue was not "essential to the judgment" for purposes of collateral estoppel. See *Jarosz* v. *Palmer*, 766 N.E.2d 482, 436 Mass. 526, 529 (2002) (for purposes of collateral estoppel, " 'essential to the judgment' " refers to issue that is essential to final determination on merits of underlying claim).

We recognize that counsel for a minor child and a guardian ad litem have a unique role in acting on behalf of a minor child during juvenile proceedings; see footnote 19 of this opinion; and that repeated attacks on intermediate

findings leading up to termination proceedings reflect the policy concerns that are the basis for the doctrine of collateral estoppel. See *In re Stephen M.*, 109 Conn. App. 644, 663–65, 953 A.2d 668 (2008) (discussing importance of collateral estoppel in context of child welfare proceedings). Given our well settled law governing collateral estoppel, however, that doctrine is not applicable under the current circumstances to bar relitigation of Horrocks' alleged conflict of interest.

[15] Horrocks' prior representation of the respondent as the guardian ad litem is easily distinguishable from Geremia's, whose previous representation of the respondent occurred as an attorney during a child delinquency proceeding.

[16] The respondent also cites to part II (g) of the Code of Conduct for Counsel for the Minor Child and Guardian Ad Litem for the proposition that an attorney for the minor child or the guardian ad litem should "[a]void any actual or apparent conflict of interest or impropriety in the performance of his or her responsibilities." That part, however, extends discretion to the attorney for the minor child and the guardian ad litem for making a determination as to whether a conflict of interest exists. More importantly, the Code of Conduct for Counsel for the Minor Child and Guardian Ad Litem does not displace our case law governing disqualifications of attorneys under rule 1.9 of the Rules of Professional Conduct. To hold otherwise would contradict explicit language in the preface to the Code of Conduct for Counsel for the Minor Child and Guardian Ad Litem, which provides that its provisions be "[c]onsistent with . . . other applicable statutes and rules of court . . . ." See also *In re Christina M.*, 280 Conn 474, 491, 908 A.2d 1073 (2006) ("[t]he primary role of any counsel for the child including the counsel who also serves as guardian ad litem, shall be to advocate for the child in accordance with the Rules of Professional Conduct")

[17] In ruling on these motions, the court was not asked to distinguish its findings between Geremia's representation of the respondent as her former attorney and Horrocks' role as the respondent's guardian ad litem in 2005.

[18] As counsel for the respondent candidly admitted at oral argument before this court, there was nothing in the record that suggests some taking of confidential information during the 2005 proceedings that would not have already been disclosed in the ordinary circumstances of the termination of parental rights proceedings. Counsel for the respondent could not point to any specific confidential information that the respondent was seeking to protect.

Moreover, in responding to Schroeder's request for her personal history, the respondent gave specific and detailed information about numerous instances of early trauma as a child and teenager, including sexual and physical assault, suicidal ideation, substance abuse, and domestic violence between her parents. Likewise, the social studies filed by the petitioner document in the family history section the respondent's similarly detailed accounts of her exposure to domestic violence and extreme physical abuse, her placement at various facilities, suicidal ideation, and her psychiatric diagnoses as a youth, much of which was confirmed by her juvenile record, which itself included several evaluations of the respondent.

[19] We note that the nature of the relationship between an attorney for the minor child and the child he or she represents is particularly important in the context of juvenile proceedings. The significance of that relationship was discussed at length by our Supreme Court in *Carrubba* v. *Moskowitz*, 274 Conn. 533, 877 A.2d 773 (2005). Holding that attorneys for the minor child were entitled to absolute immunity from suit, our Supreme Court recognized that, by virtue of their appointment to represent the child's best interest, they, like guardians ad litem, are obliged to represent children with "a higher degree of objectivity . . . than that for an attorney representing an adult" with "functions integral to the judicial process in carrying out the purpose of [General Statutes] § 46b-54—to assist the court in determining and serving the best interests of the child." Id., 545–46. This heightened degree of representation by an attorney for a minor child applies equally in child protection proceedings.

Moreover, the petitioner's concern for the practical consequences of disrupting a relationship between a child and his or her representative is well founded. We have long observed that repeated disruption in the relationships a child has makes them more vulnerable in their ability to attach and form trusting relationships. See, e.g., *In re Nevaeh W.*, 317 Conn. 723, 732–33, 120 A.3d 1177 (2015) (noting that "[c]hildren need secure and uninterrupted emotional relationships with adults who are responsible for their care" and that continuous foster care placements make a child "more vulnerable and

make each subsequent opportunity for attachment less promising and less trustworthy than the prior ones"); *In re Davonta V.*, 285 Conn. 483, 495, 940 A.2d 733 (2008) ("[r]epeatedly disrupted placements and relationships can interfere with the children's ability to form normal relationships when they become adults" [internal quotation marks omitted]). To the extent that counsel and the guardian ad litem for a child seek to advocate for a child's best interest in stable and trustworthy relationships, the quality of their advocacy is necessarily premised on the trust developed between them and the child over time. Courts cannot sever those relationships based on the insufficient evidence of the sort that was presented to the trial court.

We further take issue with the perfunctory fashion in which the respondent's counsel sought to disqualify Horrocks, seeking to disqualify her on the first day of the termination of parental rights trial. Our courts have underlined the necessity for termination proceedings to proceed in an expeditious manner, irrespective of the outcome. See *In re Stephen M.*, 109 Conn. App. 644, 665, 953 A.2d 668 (2008); see also *In re Samuel R.*, supra, 163 Conn. App. 322.

[20] The respondent also argues that the social studies exceed the scope of General Statutes § 45a-717 (e) (1). It is unclear, however, whether this assertion pertains to the content contained in the social studies itself—an argument she made in support of her motion in limine—or if it is merely descriptive of the claimed error that the court never ordered the social studies to be prepared. Even if we assume that the respondent sought to repeat her assertion made at oral argument on the motion in limine—that the social studies had exceeded the scope of the relevant statute because they were adjudicatory in nature—we also find this argument to be without merit. Section 45a-717 (e) (1) clearly provides the department with discretion to include "facts as may be relevant to the court's determination of whether the proposed termination of parental rights will be in the best interests of the child . . . ." This includes "any other factors which the commissioner . . . finds relevant to the court's determination of whether the proposed termination will be in the best interests of the child." Id. Accordingly, simply because the information contained in a social study appears to be adjudicatory does not render the social study impermissibly excessive.

Furthermore, "any mandated department social study reports submitted for the court's use in the dispositional phase . . . may be filed or considered by the court or used by counsel during the adjudicatory phase of the hearing." (Citations omitted; footnote omitted; internal quotation marks omitted.) *In re Angelica W.*, 49 Conn. App. 541, 549, 714 A.2d 1265 (1998). Nevertheless, it is clear from the record that the court's adjudication of the respondent's failure to rehabilitate was not based solely on the social studies but, rather, on a plethora of testimony from service providers, social workers, and the respondent herself, along with other documentation submitted by the petitioner.

[21] Notably, the respondent does not establish that she suffered any harm as a result of the admission of the social studies before the court had mandated their production. See *In re Amneris P.*, 66 Conn. App. 377, 382–83, 784 A.2d 457 (2001) (even assuming it was error to admit evidence, respondent mother failed to show error was harmful).

[22] The respondent does not argue that a different conclusion should have been reached based on the evidence adduced at trial but, rather, that there was insufficient evidence to support the court's finding that she had failed to rehabilitate.

[23] While reasonable corporal punishment by a parent is recognized by General Statutes § 53a-18 (a) (1); see *Lovan C.* v. *Dept. of Children & Families*, 86 Conn. App. 290, 296–97, 860 A.2d 1283 (2004); it is clear from the record that corporal punishment was not an appropriate form of discipline given the children's history of exposure to physical abuse and trauma. Megan Duffy-Knight, a social worker for the department, testified that, given Gabriel's past exposure to physical abuse by Fernando and the children's constant exposure to domestic violence, using corporal punishment as a form of discipline "could be retraumatizing to them. It's not effective for them because of the history that they've experienced."